AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Kimberly Herrera Villacorte | ) | Case No. |
| | ) | |
| | ) | CR-18  717    MAG |
| | ) | |
| *Defendant(s)* | ) | |

FILED

NOV 30 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____October 22, 2018_____ in the county of _____Monterey_____ in the
_____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1001(a) | False Statements to Government Agents |
| 18 U.S.C. 3146(a)(1), 2 | Aiding and Abetting Failure to Appear After Pre-trial Release |

This criminal complaint is based on these facts:

Please see attached affidavit of FBI Special Agent Dustin McWhirter
(Approved as to form _____ AUSA Claudia A. Quiroz)

☑ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Dustin McWhirter, Special Agent, FBI
*Printed name and title*

Sworn to me over the telephone and signed by me
pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: _Nov. 30, 2018 4:40 p.m._

_____
*Judge's signature*

City and state:          San Jose, CA          Hon. Nathanael Cousins, U.S. Magistrate Judge
*Printed name and title*

Claudia Quiroz

1  ALEX G. TSE (CABN 152348)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  CLAUDIA A. QUIROZ (CABN 254419)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7019
7       FAX: (415) 436-7428
        Email: claudia.quiroz@usdoj.gov
8

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13

14  UNITED STATES OF AMERICA,                )   CASE NO.
                                             )
15        Plaintiff                          )
                                             )   AFFIDAVIT OF SPECIAL AGENT DUSTIN
16              v.                           )   MCWHIRTER IN SUPPORT OF CRIMINAL
                                             )   COMPLAINT
17  KIMBERLY HERRERA VILLACORTE,             )
                                             )
18        Defendant.                         )
                                             )
19  _____      )

20

21        I, Dustin McWhirter, a Special Agent with the United States Department of Justice, Federal

22  Bureau of Investigation (FBI), being duly sworn, depose, and say:

23  I.    AGENT BACKGROUND

24        1.      I am a Special Agent (SA) with the United States Department of Justice, Federal Bureau

25  of Investigation (FBI), and have been so employed since August 2008.  I am currently assigned to the

26  North Central Coast Gang Task Force, San Francisco Division, Monterey Bay Resident Agency.  As a

27  Special Agent of the FBI, I am authorized to investigate violations of the laws of the United States, and I

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. My training consisted of 21 weeks of New Agent Training classes during which I received instruction on various aspects of federal investigations. I have also completed the 2-week FBI Evidence Response Team Basic course, 2-week SWAT Basic Course, 1-week SWAT WMD course, and 2-week FBI Firearms Instructor course. During my training to become a Special Agent, I have studied a wide variety of Criminal and National Security investigations. I was originally assigned to the FBI Buffalo Field Office where I worked domestic and international terrorism investigations. Through the four years I spent there I interviewed numerous individuals, conducted confidential human source meetings, wrote and executed FISA search warrants, and conducted surveillance.

2.      Since my assignment with the North Central Coast Gang Task Force (NCCGTF) in 2012, I have participated in the investigation of violent and reactive crime, Hispanic gangs and Mexican Drug Trafficking Organizations.   As a Special Agent, I am responsible for enforcing Title 21, United States Code, Section 841 - Controlled Substances Act and investigation into criminal organization and street and prison gang activities. While employed in my current assignment, I have participated in the investigation of violations of Title 21, Title 18 and the execution of arrest and search warrants involving offenses pertaining to the distribution of illegal narcotics and gang activity. I have participated in numerous federal search warrants and arrests involving alleged narcotics trafficking and gang activity both here and as a member of the FBI Buffalo, NY division. These investigations have involved the use of confidential sources, undercover officers, and physical surveillance.

3.      I have interviewed drug dealers, drug users, and knowledgeable confidential informants about the lifestyles, appearances, and habits of drug dealers and users. I have interviewed and participated in over forty interviews of active and former gang members who discussed the structure and criminal acts of the organization. I have completed over 48 hours of gang related training. I have been trained by very experienced law enforcement officers assigned to the NCCGTF from the California Highway Patrol and California Department of Corrections and Rehabilitation on narcotics, narcotic trafficking, prison gangs, street gangs, history of gangs, and methods used by gang members to communicate, enforce rules of the organization, launder money, and generate money. I have become familiar with the manner in which

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1  narcotics traffickers smuggle, package, transport, store, and distribute narcotics, as well as how they
2  collect and launder drug proceeds.

3       4.      I am also familiar with the manner in which narcotics traffickers and gang members use
4  telephones, cellular telephone technology, intentionally vague language, coded communications and
5  slang-filled conversations, false and fictitious identities, and other means to facilitate their illegal activities
6  and to thwart law enforcement investigations.  I am familiar with the production and use of "kites" used
7  by gang members to pass intelligence in the jail and prison systems.  I have had discussions with other
8  law enforcement personnel about the packaging and preparation of narcotics, the distribution methods of
9  illegal narcotics traffickers, and the security measures that narcotics traffickers and gang members often
10 employ.  I have also examined documentation of various methods by which cocaine, methamphetamine,
11 marijuana, and other illicit drugs are smuggled, transported and distributed.

12       5.      I have participated in surveillance of narcotics traffickers.  During surveillance, I have
13 personally observed narcotics transactions, counter-surveillance techniques, and the ways in which
14 narcotics traffickers conduct clandestine meetings.  I have participated in searches of vehicles used by
15 narcotics traffickers and seen how they use natural voids or manmade traps within the vehicle to conceal
16 narcotics, money, or weapons.  I have also participated in undercover officer operations.

17       6.      I have interviewed current and former gang member who spoke about violent acts
18 conducted by gang members for the benefit of the gang or the gang members. These violent acts include:
19 murder, shootings, assaults, armed carjacking, armed robbery, and bank robbery.  Gang members
20 participate in these acts to bolster their status within the gang and/or to generate money for the gang and
21 themselves.

22       7.      Prior to becoming a Special Agent for the FBI, I was an Infantry Officer in the United
23 States Army.  I was assigned to various Infantry positions and was deployed to Baghdad, Iraq for fifteen
24 months where I participated in counter insurgency operations that involved confidential sources and
25 searches of homes and vehicles.  I received a Bachelor of Science Degree from Western Illinois University.

26       8.      The statements contained in this affidavit are based, in part, on my training and years of
27 investigative experience, and my personal participation in this investigation.  The statements contained in

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1   this affidavit are sometimes based on information provided by other law enforcement officers who have

2   knowledge of the criminal activities of JASSO and HERRERA VILLACORTE.

3       9.      Because this affidavit is submitted for the limited purpose of establishing probable cause

4   in support of a Complaint, it does not set forth each and every fact that I, or others, have learned during

5   the course of the investigation.  Rather, I have set forth only those facts that I believe are necessary to

6   establish probable cause for the Complaint sought herein.  Unless otherwise indicated, where actions,

7   conversations, and statements of others are related herein, they are related in substance and in part.

8   **II.    PURPOSE OF THIS AFFIDAVIT AND RELEVANT LAW**

9       10.     This affidavit is being submitted in support of a criminal complaint charging Kimberly

10  Natalie HERRERA VILLACORTE with a violation 18 U.S.C. § 1001(a)(1)(2) (False Statements to

11  Government Agents) and 18 U.S.C. §§ 3146(a)(1), 2 (Aiding and Abetting Failure to Appear After Pre-

12  trial Release).

13      11.     Title 18, United States Code, Section 1001(a)(1)(2) prohibits a person from knowingly and

14  willfully making any material false, fictitious, or fraudulent statement or representation in any matter

15  within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United

16  States.

17      12.     The elements of Title 18, United States Codes, Section  3146(a)(1) are the following:

18          a.      defendant was released pursuant to the Bail Reform Act of 1966;

19          b.      defendant was required to appear in court;

20          c.      defendant was aware of this required appearance;

21          d.      defendant failed to appear as required; and

22          e.      defendant was willful in his failure to appear.

23      13.     Title 18, United States Code, Section 2 provides that whoever commits an offense against

24  the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable

25  as a principal.

26  / / /

27  / / /

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

4

III.   **FACTS ESTABLISHING PROBABLE CAUSE**

   A.   **Charges Against Jorge JASSO and Bail Hearing**

14.   On September 27, 2018, a federal grand jury in the Northern District of California indicted defendant Jorge JASSO, along with fourteen other individuals, with violation of several offenses, including racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); conspiracy to commit attempted murder in aid of racketeering, in violation of 18 U.S.C. §1959(a)(5); and conspiracy to commit assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(6). *United States v. Magdaleno et al.*, CR-18-466-BLF (NDCA).   The indictment alleges that the defendants, including JASSO, are members of the "*Nuestra Familia* – Salinas *Norteños* Enterprise," which consists of *Nuestra Familia*, their leadership, members, and associates, and members of their affiliate organizations, including *Nuestra Raza*/Northern Structure, the Salinas *Norteños*, and the Northerners.

15.   On October 10, 2018, law enforcement officers arrested JASSO and several of his codefendants pursuant to arrest warrants issued in conjunction with the Indictment. On October 11, 2018, JASSO appeared before the Magistrate Judge in the San Jose Division of the Northern District of California for an initial appearance and arraignment.   With the government's agreement, the Court released JASSO on his own recognizance and under certain conditions, to include electronic monitoring. The Court set a bond hearing on October 22, 2018 at 1:30 p.m. so that further release conditions could be set after U.S. Pretrial Services had an opportunity to interview JASSO and so that any sureties and/or custodians could appear to sign on his bond.

   B.   **JASSO's Disappearance and HERRERA VILLACORTE's Statements to the FBI.**

16.   On the morning of October 22, 2018, at approximately 8:30 a.m., U.S. Pretrial Services received an automatic alert that JASSO's electronic monitoring device had ceased recording his movements and body temperature.   Contemporaneously, at approximately 8:43 a.m., Kimberly Natalie HERRERA VILLACORTE, Jorge JASSO's girlfriend placed a call to 911 to report a home invasion at JASSO's residence. Soledad Police Department (SPD) officers were dispatched to JASSO's residence in Soledad, California in response to the 911 call.

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

17.    SPD Sergeant Jorge Arreola was one of the officers who arrived on scene in response to the call.  As Sgt. Arreola walked towards the front door of the residence, he noticed a fully opened white screen security metal door and a partially ajar front door.  Sgt. Arreola approached the door and located HERRERA VILLACORTE standing in the living room area on her cell phone.    HERRERA VILLACORTE appeared to be nervous, but did not show any signs of distress.

18.    HERRERA VILLACORTE made several statements to Sgt. Arreola, which she repeated to me after I arrived on the scene during an interview.  Specifically, HERRERA VILLACORTE told me the following:

19.    HERRERA VILLACORTE stated that she had been sleeping on a couch located directly next to the front door of the residence when she suddenly heard a loud bang coming from the direction of the front door.  She said that she immediately woke up, and as she turned her head to look towards the direction of the front door, somebody struck her on the back of her head and grabbed her by her hair. According to HERRERA VILLACORTE, the intruder(s) then forced her off the couch, shoved her into a small closet located within 15 feet of where she was sleeping, and locked the door.  The closet door had a manual lock on the outside but lacked a knob in the inside, which is reportedly how they were able to lock her inside.  When asked whether she was able to describe the suspect(s), she responded that the only thing she saw was a part of an arm and a hand that was covered in black.

20.    HERRERA VILLACORTE stated while she was inside the closet yelling for help, she overheard her boyfriend, Jorge JASSO Jr. coming down the stairs and confronting the intruders. HERRERA said that she then heard what sounded like a struggle and one of the suspect(s) shouting, "You fucken rat!"  HERRERA VILLACORTE added that minutes later, Jasso's father., ran downstairs and unlocked the closet door so that she could get out.

21.    HERRERA VILLACORTE stated that after she was released from the closet, she and JASSO's father discovered that JASSO was missing.  HERRERA VILLACORTE said that JASSO was currently on an ankle monitor and that his cell phone was missing.  HERRERA VILLACORTE expressed concerns that JASSO had possibly been kidnapped because she believed that the unknown suspect(s) assumed he was cooperating with federal agents.

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

22.     According to HERRERA VILLACORTE, she and Jasso met at a party in May or June of 2016.  She stated that approximately three weeks later, JASSO was taken into custody for a DUI. HERRERA VILLACORTE added that she and JASSO maintained communication with one another via phone calls, mail, and visitations when he was transferred to Pleasant Valley State Prison.  When asked how she would describe their relationship now, she replied that she and JASSO were becoming a little more serious and had talked about moving in together.  HERRERA VILLACORTE added that they do not currently live together or have any children.  HERRERA VILLACORTE stated that she is a student at Fresno State and resides in the City of Fresno.  When asked if he was committed/loyal to JASSO, she replied, "Yes."

23.     During my interview with HERRERA VILLACORTE, she made several additional statements, which I found to be unusual and suspicious.  For example, two hours after JASSO was purportedly kidnapped, HERRERA VILLACORTE disabled her Facebook account.  When asked why she had done so, she stated that she had previously disabled her account because she was going to school and enabled it right after JASSO disappeared in case he contacted her or sent her a message through it. Oddly, however, HERRERA VILLACORTE previously told officers that JASSO had no social media so her explanation failed to make sense.  The timing of her actions made it more likely that she was disabling her account to conceal evidence.  In addition, I learned that the previous evening, JASSO asked his father to make an ATM withdrawal of $300, which is the maximum amount of money that can be withdrawn from an ATM in one day.

24.     Sgt. Arreola conducted a visual inspection of the top of HERRERA VILLACORTE's head where she said the intruder(s) had hit her.  There were no visible injuries or any redness, marks, or swelling, even though he conducted the inspection soon after the incident purportedly occurred.  Hours later, Sgt. Arreola and Monterey County District Attorney Investigator Maribel Torres-Hart conducted a second visual inspection of the top portion of HERRERA VILLACORTE's head and again found no visible signs of injury.  Nonetheless, HERRERA VILLACORTE claimed that the impact to her head had been so severe that she felt dizzy and complained of pain and pressure to the front part of her head, even though several hours had passed.

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

25.     A physical examination of the premises and further investigation raised suspicions about HERRERA VILLACORTE's account of the invasion.  For example, Sgt. Arreola examined the front door of the residence and noticed that it had been forced open by unknown means.  Although part of the wooden doorframe had been torn off the wall and was lying in the middle of the living room floor, there were no fresh footprints or impact marks on the door itself.  In addition, after learning that the residence was equipped with video surveillance cameras, Sgt. Arreola spoke with Jasso Sr., who confirmed that the cameras worked, but were not plugged in during the home invasion.

26.     Per tracking records, the electronic monitoring bracelet that JASSO had been wearing was cut off at approximately 8:35 a.m. and was pinging somewhere within the vicinity of the residence.  An SPD officer conducted an area check on foot and located the ankle monitor lying on the ground between JASSO's residence and the house next door.  The bracelet had a straight cut at an angle.  There were no blood stains or spatter near or around where the ankle bracelet was located.

27.     During my interview with HERRERA VILLACORTE, she told me that her cell phone number is (831) 998-4891, that her cellular provider is Sprint PCS, and that she has had that number for the past two years.

28.     Also during my interview with HERRERA VILLACORTE, she told me that she was aware of the charges against JASSO and that she had gone over the Indictment with him.  She was also aware that he had been arrested pursuant to an arrest warrant.  I also know based on other conversations that HERRERA VILLACORTE was fully aware that JASSO had to appear in court on October 22, 2018 for a bail hearing.

29.     In the 911 audio call placed by HERRERA VILLACORTE, she did not appear to be in distress or acting hysterical in any way, which would be the normal response under the circumstances.  Instead, HERRERA VILLACORTE calmly informed dispatch the reason for the call and remained on the phone until officers arrived.  In the following days, Sgt. Arreola spoke with HERRERA VILLACORTE numerous times over the telephone.  During each conversation, each initiated by Sgt. Arreola, HERRERA VILLACORTE appeared unconcerned and did not seem worried about JASSO's kidnapping.  HERRERA VILLACORTE did not seem concerned about the safety, well-being, or the whereabouts of her missing

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1  boyfriend. Rather, HERRERA VILLACORTE seemed to be moving forward and continued to act as
2  though nothing had happened or as if JASSO had not been kidnapped and was not missing.

3      30. Neither HERRERA VILLACORTE nor JASSO's father attempted to call any of the
4  investigative agencies involved (including the FBI) for updates on the investigation into JASSO's
5  disappearance. Indeed, I attempted to contact HERRERA VILLACORTE several times following my
6  interview with her on October 22, 2018, but she appeared to be evading my attempts to contact her. She
7  also failed to respond to my voice and text messages. In my experience, when a person is kidnapped, the
8  usual response is for family members and significant others to reach out to law enforcement for updates
9  on their investigation, which did not happen in this case.

10      31. Based on my investigation, interviews, and evaluation of the facts, I suspected that this
11  incident was an orchestrated hoax to get JASSO out of the area to evade prosecution and not having to
12  appear in court, rather than a legitimate abduction. This is based on the following facts and
13  inconsistencies: (1) there were no witnesses to the actual kidnapping; (2) there were no markings on the
14  front door that would indicate a forced entry despite the fact that the door trim had detached from the door
15  and was laying on the ground; (3) the surveillance cameras to the house were coincidentally disconnected
16  at the time of the purported kidnapping despite the fact that JASSO's father stated that they were in
17  working condition; (4) there were no signs of a struggle and nothing seemed out of place in the living
18  room where the abduction reportedly occurred; (5) JASSO's father was coincidentally in the shower at
19  the same time of the purported abduction; (6) there were no apparent signs of a struggle or blood spots or
20  spatter located inside the house or within the immediate area of where the ankle monitor was found; (7)
21  there were no visible injuries to HERRERA VILLACORTE despite the fact that she complained of pain
22  hours after the reported incident occurred; (8) the unusual nature of the closet door where HERRERA
23  VILLACORTE was reportedly placed by the perpetrator—a door equipped with a locking door knob on
24  the outside but with a missing door knob in the inside; (9) HERRERA VILLACORTE's general lack of
25  concern about JASSO's safety and the possibility that he was kidnapped; (10) the fact that HERRERA
26  VILLACORTE disabled her Facebook account two hours after the reported incident, which would
27  indicate that she was trying to conceal evidence; (11) except as directed by the police, neither HERRERA
28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1   VILLACORTE nor Jasso Sr. attempted to call JASSO's cell phone in the two-hour period after he

2   disappeared; (12) neither HERRERA VILLACORTE nor JASSO's father reached out to law enforcement

3   since the incident to inquire whether there have been any leads on JASSO's disappearance; (13) neither

4   HERRERA VILLACORTE nor JASSO's father received suspicious calls or ransom demands; (14)

5   HERRERA VILLACORTE appeared to be dodging my telephone calls; and (15) JASSO's body had not

6   been found.  In addition, it was highly suspicious that JASSO disappeared on the morning of his bail

7   hearing, where the Court would have asked his father to sign a bond to secure his release from custody.

8   Without a signed bond in place, there would be no recourse against any sureties if he fled to avoid having

9   to appear in court and to avoid prosecution.  Based on this, I developed a belief that HERRERA

10  VILLACORTE had been involved in assisting JASSO jump bail and that she had lied to me during my

11  interview with her.

12      32.     The Court issued a bench warrant for JASSO's arrest on the day of his disappearance,

13  October 22, 2018 for failure to appear as required by the Court's prior order releasing him from custody.

14      **C.     Subsequent Investigation into JASSO's Disappearance.**

15      33.     Based on the suspicious nature of JASSO's disappearance, the inconsistencies in

16  HERRERA VILLACORTE's account of what transpired, and my belief that she had lied to me, local law

17  enforcement and I initiated an investigation into HERRERA VILLACORTE and her activities.  This

18  included obtaining warrants to place a tracker on her vehicle and to obtain GPS location (a "ping"), and

19  call records on her cellular telephone and other cellular telephones as set forth below.  Our investigation

20  led us to the following:

21      34.     On November 3, 2018, HERRERA VILLACORTE traveled from Fresno, California to

22  Soledad, California in her vehicle.  During the course of her trip she engaged in counter surveillance to

23  see if anybody was following her.  Specifically, HERRERA VILLACORTE entered a Cricket Wireless

24  store earlier that day and exited with a brown Cricket shopping bag.  At approximately 12:40 p.m. on that

25  day, a California Highway Patrol (CHP) Officer saw HERRERA VILLACORTE drive down the road

26  approximately a quarter of a mile to an Arco AM/PM store and place a bag in the trash can.  Upon

27  searching the trash can, the CHP Officer located a Cricket Wireless bag containing an empty cellular

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1  phone box with paper work for a new cellular telephone.  The number on that phone was (661) 264-8307

2  (hereinafter the "Cricket Phone").  Based on the aforementioned, the government subsequently sought and

3  obtained a warrant for GPS location and call records for the Cricket Phone.

4        35.    HERRERA VILLACORTE then left Fresno and was seen stopped at the Food for Less in

5  Los Banos, CA.   When law enforcement later reviewed the ping information from HERRERA

6  VILLACORTE's original cellular telephone, they determined that HERRERA VILLACORTE shut her

7  phone off while at the Food for Less.  Some time later, HERRERA VILLACORTE drove off and

8  continued westbound on highway 152 and a CHP officer stopped HERRERA VILLACORTE for

9  speeding.  HERRERA VILLACORTE told the CHP officer that she was headed to Soledad to see her

10  parents.  I learned during my interview with HERRERA VILLACORTE on October 22, 2018 that her

11  parents do not live together—her mother lives in Gonzales and her father lives in Soledad.   Law

12  enforcement continued their surveillance of HERRERA VILLACORTE as she neared Prunedale,

13  California.  As she entered into Salinas, California, HERRERA VILLACORTE exited the highway and

14  went to a gas station on North Davis at approximately 4:11 p.m.  HERRERA VILLACORTE remained

15  parked at the gas station sitting in her car for approximately 25 minutes.  HERRERA VILLACORTE then

16  drove off and continued southbound on Interstate 101 and exited into Gonzales, California.  HERRERA

17  VILLACORTE made several stops throughout the town, but never exited the vehicle.  The surveillance

18  team saw her sitting in her car on the side of the road with her hood pulled over her head as if she was

19  trying to conceal her identity. HERRERA VILLACORTE continued in this manner from approximately

20  4:50 p.m. to 5:50 p.m.  Based on her conduct, it appeared that HERRERA VILLACORTE was conducting

21  counter surveillance and attempting to see if anyone was following her.

22        36.    A review of the call detail records for the Cricket Phone, obtained pursuant to a warrant,

23  showed that on November 3, 2018, HERRERA VILLACORTE was in contact with only one telephone

24  number: (628) 280-7136.  On that day, HERRERA VILLACORTE communicated with this number a

25  total of 15 times—11 calls and 4 text messages.  A review of HERRERA VILLACORTE's contacts,

26  which I obtained from a consent to search of her other cellular phone on the day of JASSO's suspected

27  abduction, did not show any contact with telephone number (628) 280-7136 prior to the date of JASSO's

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1   purported abduction.   Based on this information, I had probable cause to believe that HERRERA

2   VILLACORTE was communicating with JASSO on the (628) 280-7136 telephone number (hereinafter

3   "JASSO's suspected cell phone").

4           **D.      JASSO's and HERRERA VILLACORTE's Arrest.**

5           37.     On November 16, 2018, I received historical call detail records and subscriber information

6   for JASSO's suspected cell phone pursuant to another warrant. The subscriber information showed the

7   account had an effective date of October 22, 2018.   October 22, 2018 is the date of JASSO's suspected

8   abduction.

9           38.     While monitoring the active Ping Order for the Cricket Phone (661) 264-8307, I noticed

10  that the telephone was turned off and no longer being used around November 8, 2018. AT&T advised the

11  phone was still active but turned off.   On November 28, 2018, I learned that telephone number (661) 264-

12  8307 (the Cricket Phone) was turned back on and I began to receive geo-location information. I reviewed

13  the active pen register for that phone and noticed that HERRERA VILLACORTE started to make and

14  receive text messages around 3:47pm on November 28, 2018 and continued to use the telephone until

15  approximately 9:00pm on November 29, 2018.

16          39.     I reviewed the geo-location for HERRERA VILLACORTE from the time the telephone

17  was turned on until 7:30 p.m. on November 29, 2018 and noticed the error rate was very accurate and at

18  times less than 30 meters at time. HERRERA VILLACORTE appeared to be at work the previous evening

19  and then arrived in the vicinity of the Motel 6 on Blackstone Avenue in Fresno, California.   The telephone

20  arrived at the motel around 9:00 p.m. on November 28, 2018.   HERRERA VILLACORTE's vehicle was

21  also in the vicinity of the Motel 6, parked a couple of blocks away.

22          40.     At approximately 9:00 a.m., a surveillance team was set up in front of the Motel 6.   Some

23  time thereafter, the surveillance team saw HERRERA VILLACORTE and JASSO exit a room in the motel

24  and approach a white GMC Sierra, which had pulled up.   HERRERA VILLACORTE and JASSO got in

25  the car, which contained two other occupants, and drove away.   As the vehicle drove away, law

26  enforcement attempted to effectuate a car stop, at which point the GMC Sierra sped away and attempted

27  to flee. When the car was eventually stopped, JASSO got out and started to run away.   As he was running

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1  he attempted to reach for a pistol that he had on his person.  Law enforcement officers were able to detain

2  him before he could get away.  All four individuals were detained.  Among other items, the vehicle

3  contained three short barrel rifles, two with 50-100 round drums and one with an extended magazine, one

4  fully automatic Glock pistol, one semi-automatic Glock pistol, and numerous magazines and ammunition

5  rounds.

6      41.     All four individuals were arrested by the Fresno Police Department.

7      42.     Based on the aforementioned, there is probable cause to believe that JASSO and

8  HERRERA VILLACORTE developed an elaborate hoax to fake JASSO's kidnapping so that he could

9  escape and avoid prosecution in the *U.S. v. Magdaleno et al.*, matter, in which he is facing multiple

10 charges.  There is further probable cause to believe that HERRERA VILLACORTE made materially false

11 and fraudulent statements and representations to me regarding JASSO's disappearance.  In addition,

12 HERRERA VILLACORTE concealed JASSO's whereabouts and assisted him in jumping bail.

13 **IV.    CONCLUSION**

14      43.     Based on the foregoing facts, my training and experience, I believe there is probable cause

15 to believe that on or about October 22, 2018, Kimberly HERRERA VILLACORTE violated 18 U.S.C. §

16 1001(a)(1)(2) (False Statements to Government Agents) and 18 U.S.C. §§ 3146(a)(1), 2 (Aiding and

17 Abetting Failure to Appear After Pre-trial Release).

18      I declare under penalty of perjury that the statements above are true and correct to the best of my

19 knowledge and belief.

20

21                                                    /s/

22                                              DUSTIN MCWHIRTER
                                               Special Agent
23                                             Federal Bureau of Investigation

24      Subscribed to and sworn to before me over the telephone and
25      signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d)
        on this   30   day of November, 2018.   4:40pm
26

27

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1

HON. NATHANAEL COUSINS
2   UNITED STATES MAGISTRATE JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MCWHIRTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

14